274 So.2d 505 (1973)
Robert L. SHEVIN, As Attorney General of the State of Florida, Petitioner,
v.
Jess YARBOROUGH, Chairman, et al., Respondents.
No. 41944.
Supreme Court of Florida.
February 21, 1973.
Rehearing Denied April 4, 1973.
*507 Robert L. Shevin, Atty. Gen., and W. Robert Olive, Jr., Asst. Atty. Gen., for petitioner.
Prentice P. Pruitt, Chief Staff Counsel, Florida Public Service Comm., and William C. Steel, Dwight, Sullivan, and Shepard King, of McCarthy, Steel, Hector & Davis, Miami, for Florida Power & Light Co., respondents.
ADKINS, Justice.
This cause is before this Court on petition for certiorari by the Attorney General of the State of Florida to the Florida Public Service Commission to review an order of the Commission by which the rates of Florida Power & Light Company were found to be fair and reasonable. (Order No. 5280, Docket No. 9777-EU, filed December 7, 1971.) This Court has jurisdiction pursuant to Fla. Const., art. V, § 4(2), F.S.A., and Fla. Stat. § 366.10, F.S.A.
The Commission undertook on its own initiative, without complaint or application of any party, an investigation of the rates of Florida Power & Light, by Order No. 4411, Docket No. 9777-EU, filed August 15, 1968.
After some delay, the Commission set the year 1970 as the test year for the investigation and utilized a year-end rate base for determining whether the rate of return of the company was reasonable. The Attorney General intervened on behalf of the State and as a consumer of Florida Power & Light. Other intervenors represented the City of Miami, the government of the United States, and private citizens and citizens' groups.
After exhaustive hearings and the gathering of over 1,100 pages of testimony, the Commission issued Order 5280 in which it was determined that the rates of Florida Power & Light were reasonable and fair.
Before the Commission, the Company alleged a rate base of $1,394,355,000 and a net operating income of $95,632,000. The Commission adjusted the rate base downward to $1,271,827,065 and the net operating income upward to $100,898,332, yielding a return of 7.93% which the Commission found to be reasonable.
An expert witness for the Attorney General agreed that a return of approximately 8% would be reasonable, but urged that additional necessary adjustments, which he detailed, would show an actual return of 15.35%, necessitating a rate reduction of $27,000,000. The Attorney General seeks review of the Commission's order regarding several rejected adjustments and urges eight points for consideration by this Court.
"I.A. Whether the Florida Public Service Commission erred in allowing construction work in progress in the rate base in violation of Section 366.06(2), Florida Statutes [F.S.A.]?
"I.B. Whether the Florida Public Service Commission acted arbitrarily in allowing construction work in progress in rate base without pro-forming or annualizing income?

*508 "II. Whether the Florida Public Service Commission acted arbitrarily in allowing construction work in progress in the rate base without consideration of the purpose, use and prudence of the various items of construction included?
"III. Whether the Florida Public Service Commission acted arbitrarily in allowing the use of a year-end rate base without the elimination of large plant items in construction work in progress?
"IV. Whether the Florida Public Service Commission erred in allowing property held for future use in the rate base in violation of Section 366.06(2), Florida Statutes [F.S.A.]?
"V. Whether the Florida Public Service Commission's finding in regard to depreciation allowance is arbitrary, an abuse of discretion, and contrary to the evidence?
"VI. Whether the Florida Public Service Commission acted arbitrarily in disallowing income to the storm damage reserve fund from being included in net operating income?
"VII. Whether the Florida Public Service Commission erred in allowing minimum bank balances to be included in the rate base as an addition to normal working capital allowance where substantial accrual items are not deducted from cash allowance?
"VIII. Whether the Florida Public Service Commission acted arbitrarily in disallowing from operating income federal income tax accruals held for contingency audit by the United States Internal Revenue Service?"
The role of this Court in considering the points raised by the Attorney General and in reviewing the decision of the Commission is limited, and is well stated in General Telephone Company of Florida v. Carter, 115 So.2d 554 (Fla. 1959):
"[O]rders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made. On review this presumption of validity can only be overcome either where the Commission's error plainly appears on the face of the order or where such weakness is made to appear by clear and satisfactory evidence.
"It is also important that we take cognizance of the fact that review of the Commission's orders are by certiorari. From the cases it is clear that the scope of review on certiorari is limited in nature. On certiorari this Court will not undertake to re-weigh or re-evaluate the evidence presented to the administrative body whose order is under examination. Our duty is to examine the record to determine whether the Commission's order is in accord with the essential requirements of law and whether the agency had before it competent substantial evidence to support its findings and conclusions." (pp. 556, 557)
In General Telephone Company of Florida v. Carter, supra, this Court also pointed out that the orders of the Commission are considered in light of the end-result rather than the particular methods adopted,
"[S]o long as such methods do not go so far astray that they violate our statutes or run afoul of constitutional guarantees." (115 So.2d 554, 559)
However, this Court will not give effect to the "end-result" doctrine to justify improper or erroneous methods or to discourage use of proper yardsticks in determining rate base. City of Miami v. Florida Public Service Commission, 208 So.2d 249 (Fla. 1968). The burden is on the party claiming the order of the Commission to be invalid, arbitrary, or unsupported by the evidence. Fogarty Bros. Transfer, Inc. v. Boyd, 109 So.2d 883 (Fla. 1959), and City of Miami v. Florida Public Service Commission, supra.
*509 In summary, we will not overturn an order of the Commission because we would have arrived at a different result had we made the initial decision; something more is needed. However, we will not affirm a decision of the Commission if it is arbitrary and unsupported by substantial competent evidence, or in violation of a statute or a constitutionally guaranteed right.
The Attorney General, in Point I, urges that the Commission erred in including construction work in progress in consideration of rate base. First, the Attorney General urges that inclusion of construction work violates Fla. Stat. § 366.06(2), F.S.A., which reads, in applicable portion:
"The commission shall investigate and determine the actual legitimate costs of the property of each utility company, actually used and useful in the public service, and shall keep a current record of the net investment of each public utility company in such property which value, as determined by the commission, shall be used for rate-making purposes and shall be the money honestly and prudently invested by the public utility company in such property used and useful in serving the public." (Emphasis supplied)
The Attorney General urges that the language "actually used and useful" cannot, clearly, include construction work as that property is not yet available for actual use in providing service. The question is one of first impression before this Court, and one of great importance in this cause as the value of construction work in the case sub judice totaled $242,221,443.
In ruling against the position espoused by the Attorney General, the Commission relies upon Baltimore Gas and Electric Co. v. People's Counsel, 220 Md. 373, 152 A.2d 825 (Ct.App. 1959). The Maryland court, in Baltimore Gas and Electric Co. v. People's Counsel, supra, states:
"The cases make it clear that usually there will be included as part of the rate base either capitalization of interest during construction or the value of plant under construction, but not both since this would mean a duplication." (152 A.2d 828)
This states the general rule and the one followed by the Commission in the case sub judice.
However, the Attorney General urges that the inclusion of the word "actually" in the governing Florida statute indicates a clear legislative intent to require more than is required by the Maryland statute which requires the property to be "used and useful." On this basis, the Attorney General contends that the rule in this State should be to bar any inclusion of construction work in progress in consideration of rate base. He urges us to adopt, rather than the view of the Maryland court, that of the Supreme Court of North Dakota in Northern States Power Co. v. Public Service Com'n, 73 N.D. 211, 13 N.W.2d 779 (1944), where the Court construed the controlling statute in North Dakota:
"`The value which must be ascertained is the reasonable value of the utility's property used and useful for the public service at the time it is being so used.'" (13 N.W.2d 788)
However, the statute, involved in the North Dakota case is worded consistently with the one in Maryland, without the word "actually" which is utilized in our statute (Fla. Stat. § 366.06(2), F.S.A., supra), and upon which the Attorney General relies. Of even greater import, the Court in Northern States Power Co. v. Public Service Commission, supra, points out that, in North Dakota, interest is included in the rate base, so that the result in North Dakota is totally consistent with that reached in Maryland and with that reached by the Commission in the case sub judice.
Thus, the argument of the Attorney General that the Commission's position on construction work is clearly contrary to the intention of the Legislature in Fla. Stat. § 366.06(2), F.S.A., is without merit.
*510 In a related argument, the Attorney General urges that Order No. 3413, Docket No. 6655-EU, filed by the Commission July 26, 1962, is likewise invalid in that it created the authority for Florida Power & Light to include construction work in the rate base. The position of the Attorney General in this regard is also unconvincing for the reasons stated above in respect to Order 5280.
The Attorney General's second contention under Point I is that the Commission acted arbitrarily in allowing for inclusion of construction work in the rate base without pro-forming or annualizing income. The Attorney General urges that, if the Company is to be allowed to include construction work, an adjustment must be made to net revenues to account for the customers to be served by the addition. In support of this contention, the Attorney General relies on State ex rel. Utilities Commission v. Morgan, 278 N.C. 235, 179 S.E.2d 419 (1971), which contains a general statement that it would be unfair to the consumers to include costs of uncompleted construction without including an off-setting adjustment to net revenue to account for the customers to be served by the plant additions. However, in North Carolina, the governing statute specifically includes in determination of rate base only that equipment in operation at that time.
While we might have reached a contrary result if we had sat as trier of the facts, we are unable to agree with the Attorney General that the result or reasoning shows a clear abuse of discretion on the part of the Commissioners.
In Point II, the Attorney General urges that the Commission acted arbitrarily in allowing construction work to be included in the rate base without consideration of the purpose, use and prudence of the various items of construction included.
In reaching this conclusion, the Attorney General relies upon Order No. 2515, Docket No. 5098-EU, which provides for a multifaceted test for inclusion of construction work in rate base. The expert witness for the Attorney General testified that under the test, $209,429,000 of the $242,221,000 should be disallowed. However, Florida Power & Light requested a ruling from the Commission in 1962, five years after the opinion in Order 2515, and the Commission ruled that:
"[F]or rate-making purposes construction work in progress shall be excluded from the prospective rate base in every case where the utility charges interest during construction. If interest is not capitalized then the amount of construction work in progress on which no interest is charged shall be included in the prospective rate base, but in no instance shall a double return be allowed on moneys invested in construction." (Order 3413, Docket No. 6655-EU, at Sheet 3.)
The Commission, in the case sub judice, relied upon Order 3413, which contained a proviso that changed conditions in the future might require some other result. Considering the possibility of changed conditions, the Commission found such a change and ordered that half of the construction work, $121,111,000, be excluded from the rate base, and that the advantage of Order 3413 be phased out in two years, reasoning:
"Any phasing-out period of less than two years would penalize the utility for taking advantage of a valid, outstanding permissive Order of the Commission, and cannot be legally justified. On the other hand, any phasing-out period beyond two years would extend the terms of said Order needlessly and beyond the time when its use can be justified." (Order 5280, Docket No. 9777-EU, at Sheet 7.)
We have determined that the judgment of the Commission in this matter is in accord with the essential requirements of the law, supported by substantial competent evidence, and not a clear abuse of discretion. *511 Therefore, we find Point II of the Attorney General's argument to be without merit.
The Attorney General, in Point III, suggests that the Commission acted arbitrarily in allowing the use of a year-end rate base without the elimination of large plant items in construction work in progress. The Attorney General relies upon the ruling of this Court in City of Miami v. Florida Public Service Commission, supra, in which it was held that average investment during the test year rather than year-end investment should be the basis of rate base
"[I]n the absence of the most extraordinary or emergency conditions or situations." (208 So.2d 249, 258)
However, this Court upheld the findings of the Commission in City of Miami v. Florida Public Service Commission, supra, and stated:
"[W]e cannot substitute our judgment for that of the Commission in regard to its administrative determination to use the year-end test." (208 So.2d 249, 257)
The position taken by the Commission in the case sub judice is:
"[T]he law is well settled in this and many other jurisdictions that a year-end rate base is valid and proper in cases where a public utility is beset with extraordinary growth problems. In the present case, the record is clear with respect to the tremendous growth problems of Florida Power & Light. It is the fastest growing electric utility in the United States, and such extraordinary growth has been, and is, taking place during a period of unprecedented high capital and operating costs attributable primarily to inflation. It is completely unrealistic, on the basis of the present record, to say that a year-end rate base is not valid and proper." (Order 5280, Docket No. 9777-EU, at Sheet 8.)
We cannot but agree with the finding of the Commission that the growth of Florida Power & Light creates an extraordinary condition. We are, therefore, unable to uphold the contention of the Attorney General that the action of the Commission in utilizing a year-end test is unreasonable or arbitrary. As to the contention that the Commission should have excluded certain projects on the basis that they would expand rather than improve service and thus create future revenues which cannot be included in the present rate base, we are again unable to uphold the argument of the Attorney General.
Considering the very low margin of power supply under which Florida Power & Light was operating during the test year, it is impossible to say what part of the expansion of facilities would not act to improve existing service without more information than that introduced before the Commission. Therefore, we are unable to say that the Commission erred in not excluding certain projects or that this non-exclusion amounted to an abuse of discretion.
Point IV by the Attorney General raises the contention that the Commission erred in including property held for future use in rate base on the same ground that he attacked, in Point I, the inclusion of construction work in progress. The Commission considered the argument of the Attorney General and rejected it on the same reasoning that was used to reject the challenge to inclusion of construction work. However, the Commission excluded $3,553,101 of the $18,852,431 in property held by Florida Power & Light for future use on the basis that no definite plans had been developed for the use of the land excluded. It was not an abuse of discretion for the Commission to refuse to do more in excluding property held for future use.
The Attorney General urges, in Point V, that the Commission was arbitrary in its finding as to the rate of depreciation allowance *512 available to Florida Power & Light, and further that the allowance of 3.3% is an abuse of discretion and contrary to the evidence. The Commission, in the case sub judice, considered the position of the Attorney General and determined:
"The Attorney General's witness adjusted depreciation to a 3% rate. However, the Company is using a 3.30% rate by direction of this Commission. In order No. 4078, Docket No. 7759-EU, we reduced the Company's composite depreciation rate from 3.95% to 3.30%, and the Company was using that rate during the test year. We cannot penalize the utility for obeying the Order of the Commission. While the Company needs to get its depreciation `housekeeping' in order and we expect them to do just that, the purpose of this proceeding is not to establish depreciation rates, but to measure the reasonableness of the Company's earnings under existing rates approved or ordered by this Commission. We find no reasonable basis for adjusting to a 3% composite depreciation rate for the test year 1970, when the Company was at that time obeying an Order of this Commission requiring it to charge a rate of 3.30%." (Order 5280, Docket No. 9777-EU, at Sheet 11.)
The 3.3% rate relied upon by the Commission and Florida Power & Light arose from Order No. 3926, Docket No. 7759-EU, in which the Commission considered the depreciation rates employed by the other utility companies in Florida and lowered the maximum rate allowable to Florida Power & Light to 3.3%, noting:
"We recognize that such comparisons are subject to many justifiable objections. At the same time, they can be strongly indicative of a situation that needs some corrective treatment... . While we would not feel justified in basing permanent depreciation rates on such a comparison, we are convinced that a composite rate of 3.30% constitutes the maximum which can be justified as a measure of the operating revenue deduction which Florida Power and Light Company should be permitted to make for depreciation purposes until such time as sufficient evidence can be produced on the basis of which the Commission can fix adequate, fair, and reasonable depreciation rates for application by functional groups to its depreciable plant." (Order 3926, Docket No. 7759-EU, at Sheet 3.)
The Order stated that the Commission intended for the utility to employ qualified experts, approved by the Commission, to make studies sufficient to allow the Commission to establish fair rates of depreciation allowance.
The temporary maximum rate of 3.3% and the wording and reasoning of the Commission were adopted in Order 4078, but Florida Power & Light was not required to employ experts to perform the study suggested by the Commission. The Order indicated that the Commission intended to prepare such a study, which study has apparently not been prepared although Order 4078 was filed December 9, 1966.
The evidence presented by the Attorney General before the Commission consisted of an averaging of the rates allowed to 17 major utility companies across the nation, and this evidence is self-admittedly not sufficient for a finding as to what is proper for Florida Power & Light. We feel that the passage of six years from the establishment of a temporary maximum depreciation rate which is still being utilized and enforced up to the maximum allowed is overly long without the intensive study suggested and promised by the Commission. We, like the Commission, expect the "depreciation `housekeeping'" to be brought into order, as soon as such a study can practically be undertaken and completed. The delay which has allowed a public utility to continue to utilize a depreciation rate which may well be excessive and injurious to the millions of consumers of *513 Florida Power & Light is contrary to the watchdog duty of the Commission.
However, faced with the dearth of evidence on which to base an adjusted rate, we cannot agree with the Attorney General that the Commission acted arbitrarily or in a manner contrary to the evidence in continuing to apply the 3.3% depreciation rate. Therefore, we are forced to uphold the application of the 3.3% rate by the Commission and urge that a study of the depreciation rate system be undertaken in a separate proceeding by the Commission immediately.
The Attorney General, in Point VI, says that the Commission acted arbitrarily in allowing Florida Power & Light to credit the income derived from investment of the moneys in the Storm Damage Reserve Fund to the fund rather than including it in net operating income.
The Attorney General urges that the intent of Order 4078 was to freeze the fund at the $9,400,00 level at which it rested when the Order was filed in 1966, and to disallow further contributions to the fund including those amounts derived from investment of the fund capital. The plain wording of Order 4078, which altered the procedures followed by the utility, supports the position taken by the Commission in the case sub judice:
"The Commission found that there was no further need for annual charges to operating expenses for the benefit of the reserve, but required the Company to continue crediting to said fund the annual net income from the fund's investments." (Emphasis supplied) (Order 4078, Docket No. 7759-EU, at Sheets 22, 23.)
The wording of the Order upon which the Attorney General relies not only allows but requires Florida Power & Light to continue crediting to the Storm Damage Reserve Fund the income from the fund's investment, and this the company has done. The intent of Order 4078, clearly, was not to freeze the level of the fund, but to make the fund self-supporting.
In Point VII, the Attorney General contends that the Commission erred in allowing minimum bank balances to be included in the rate base as an addition to normal working capital where substantial accrual items are not deducted from the cash allowance. In a prior order, the Commission had allowed Florida Power & Light $10,000 per bank in 150 banks as a reasonable bank balance. Order 4078, supra. In the case sub judice, the evidence was that the company is now utilizing 182 banks, althought it does not maintain a $10,000 minimum balance in each bank. Therefore, the Commission considered the minimum balances held in those banks which did not require a minimum balance of $10,000 and allowed a total minimum balance of $1,488,000 for the 182 banks with a maximum allowance of $10,000 for any one bank. The evidence presented by the company was that the actual minimum balance retained by the company for normal banking purposes is over $1,500,000 and averaged around $7,000,000 over the test year.
The Attorney General relies on several cases which stand for the proposition that minimum bank balances should not be included in rate base without adjustments where it does not appear that such balances are required for the carrying on of business. In re Union Producing Co., 52 P.U.R.3d 68 (F.P.C. 1964). We agree, but the evidence presented before the Commission could support the finding of the Commission that a minimum bank balance should be allowed as the company utilizes banks throughout its service area as collection points and otherwise relies on its bank accounts in the carrying on of its day-to-day business transactions. We are, therefore, unable to find that the Commission abused its discretion in allowing for the inclusion of minimum bank balances in rate base.
*514 The final point raised by the Attorney General challenges the decision of the Commission to disallow from operating income federal income tax accruals held for contingency audit.
The policy followed by the company in regard to income tax accruals is that the company accrues sufficient money to cover all tax liability claimed by the Internal Revenue Service, but pays only that portion to which it feels the Service is entitled. The difference between the amount paid and the amount claimed by the Service is then held by the company for contingency audit, to pay any amount which the Service determines it is, in fact, entitled.
The Attorney General urges that a proven history of over-accruals has acted to understate the net operating income and thus to lower the resulting return rate to an acceptable level. Florida Power & Light contends that by retaining the funds, which may be required by the Service at any time with interest, the company is acting to protect the company from being injured by a lack of funds. In addition, the company points out that only the amount claimed by the Service is retained for this purpose and the funds released by the Service through recognized deductions act to immediately lower the amount of excess funds thus retained.
In considering the argument of the Attorney General, the Commission held:
"We cannot agree with this approach and find that no adjustment should be made until the Internal Revenue Service has audited the figures and the amount of any over-accrual is precisely and definitely known." (Order 5280, Docket No. 9777-EU, at Sheet 23.)
We cannot agree with the Attorney General that the action of the Commission as regards this or any other of the points raised represents arbitrary action such as would justify reversing any portion of the order of the Commission.
Accordingly, the writ of certiorari is discharged.
It is so ordered.
ROBERTS, Acting Chief Justice, BOYD and DEKLE, JJ., and DREW, J. (Retired), concur.